UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE CANTERBURY SECURITIES, LTD.,

                 Debtor in a Foreign Proceeding.

---

ERIN WINCZURA,

                 Appellant,

            -v-

KAREN SCOTT *and* RUSSELL HOMER,
*Foreign Representatives of Canterbury Securities, Ltd.*,

                 Appellees.

25 Civ. 2502 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

This appeal arises from a proceeding in which the United States Bankruptcy Court in this District (the "Bankruptcy Court"), acting under Chapter 15 of the U.S. Bankruptcy Code, granted a petition to recognize a Cayman Islands bankruptcy proceeding relating to Canterbury Securities, Ltd. ("Canterbury"). The Bankruptcy Court also granted related relief. In the Bankruptcy Court, Erin Winczura, Canterbury's former owner and director, opposed recognition and the related relief, and moved to dismiss the Chapter 15 proceeding. Winczura now appeals the Bankruptcy Court's denial of that motion. For the following reasons, the Court affirms the Bankruptcy Court's decision.

## I.    Background

### A.    The Parties

Canterbury is a limited liability company incorporated in the Cayman Islands. Bankr. Dkt. 2-2 (certificate of incorporation). On January 1, 2020, Canterbury registered with the main

financial services regulator of the Cayman Islands "to conduct securities investment business for high net worth" individuals.  Bankr. Dkt. 3 (declaration of John Harris, counsel for Canterbury in Cayman proceeding) ("Harris Decl.") ¶ 15.

Winczura is a Canadian national and Cayman Islands resident.  Bankr. Dkt. 17 ("Scott Decl.") at 17.

Karen Scott and Russell Homer, the appellees here, are the joint official liquidators of Canterbury.  They were appointed such by the Financial Services Division of the Grand Court of the Cayman Islands (the "Cayman Court").  Bankr. Dkt. 17-3 (January 16, 2024 winding up order) ("Winding Up Order") at 2.[1]

### B.    Events Leading to Canterbury's Insolvency

Between approximately 2015 and late 2023, Winczura, Canterbury's founder, was its owner and chief executive.  Bankr. Dkt. 17-1 (August 17, 2023 judgment by the Cayman Court) ("Cayman Liability Decision") ¶ 11; Harris Decl. ¶ 19.

In May 2018, Canterbury entered into a brokerage agreement with Fortunate Drift Ltd. ("FDL"), a company incorporated in the British Virgin Islands, to hold certain NASDAQ-listed shares ("YRIV shares") on behalf of FDL.  Cayman Liability Decision ¶¶ 9–10.  To help FDL raise more capital, Winczura introduced FDL representatives to PFS Ltd. ("PFS"), a Cayman Islands company she owned, as a potential source of financing.  *Id.* ¶¶ 10, 24.  As detailed below, whether Winczura disclosed her stake in PFS to FDL is disputed and the Cayman Court later found that she had not.  *Id.* ¶¶ 27, 49 (court had "little difficulty in finding that [Canterbury] presented PFS to FDL as an unrelated third party in light of the unambiguous contemporaneous

---

[1] The Bankruptcy Court found Scott and Homer to be Canterbury's duly appointed foreign representatives, within the meaning of 11 U.S.C. § 101(24).  Bankr. Dkt. 9 (November 15, 2024 order granting recognition and related relief) ("November 15 Order") ¶ 6.

record and rejecting [] Winczura's evidence on this issue," including her contrary testimony);
Harris Decl. ¶ 20 ("Unbeknown to FDL, PFS was also owned and controlled by Winzcura.").

In August 2018, FDL entered into a stock purchase agreement (the "SPA") with PFS.
Cayman Liability Decision ¶ 10.  Under the SPA, PFS agreed to purchase more than 1.1 million
YRIV shares from FDL.  *Id.*  The SPA included a put option that gave PFS the right to sell the
shares back to FDL, within three months, at a strike price of $11.26 per share, for approximately
$12.9 million.  *Id.* ¶ 45.  Under the SPA, PFS would waive the put option if it were to move the
shares from Canterbury or short YRIV.  *Id.*  FDL continued to keep its unsold YRIV shares at
Canterbury as collateral, in the event that PFS exercised the put option.  *Id.* ¶¶ 25, 65–68.

Disputes among the three companies arose almost immediately.  Even before FDL
received the purchase money owed under the SPA, PFS started to sell YRIV shares.  *Id.* ¶ 126.
On September 19, 2018, FDL wrote Canterbury: "The Put Provision of the SPA has been
waived, and FDL's stock may no longer be used as collateral."  *Id.* ¶ 67.  FDL instructed
Canterbury to return FDL's remaining shares.  *Id.*  Canterbury refused, based on ostensible
uncertainty as to whether PFS had actually waived the put option.  *Id.* ¶¶ 25, 167(b).

On December 6, 2018, negative press reporting as to YRIV caused its stock price to
plummet.  *Id.* ¶¶ 9, 72(g), 106.  That and the following day, Canterbury conducted a "fire-sale"
of 1.71 million YRIV shares owned by FDL, which netted nearly $20 million while causing the
stock price to drop even further.  *Id.* ¶ 72(e), (g).  Canterbury did so without FDL's authorization.
*Id.* ¶¶ 72(f)–(g), 79.  Canterbury asserted that it had been necessary to liquidate these shares to
secure FDL's obligations under the put option.  *Id.*

Canterbury thereafter, the Cayman Court found, demonstrated a "lack of forthrightness
about what happened to the [approximately $20 million in] proceeds of the sell-off."  *Id.* ¶ 166;

*see also* Harris Decl. ¶ 21 (Canterbury "appropriated the proceeds."). The location of these proceeds remains unresolved.

### C.    Proceedings in the Cayman Islands

#### 1.    Pretrial Proceedings and Trial Evidence

In approximately late 2018, FDL filed suit against Canterbury in the Cayman Court. *See* Cayman Liability Decision at 1. It alleged that Canterbury had unlawfully (1) refused to return FDL's YRIV shares, worth more than $50 million; (2) sold $20 million of such shares; and (3) kept the sale proceeds and FDL's remaining YRIV shares. *Id.* at 2. FDL brought common law claims for breach of fiduciary duty, breach of contract, conversion, and unjust enrichment. *Id.*

Canterbury filed counterclaims and asserted affirmative defenses based on, *inter alia*, illegality, unclean hands, and conspiracy. *Id.* In brief, it alleged that FDL had falsely induced it to provide brokerage services as part of a scheme to manipulate YRIV's share price. *Id.* at 1–2.

Before trial, the Cayman Court received substantial briefing from both sides, made rulings, and held at least one hearing. *See, e.g.*, *id.* ¶¶ 49, 54, 106, 109, 146. Between June 5 and 14, 2023, it presided over a nearly two-week bench trial as to liability. *See id.* at 1. Three fact witnesses (Winczura, PFS director Brian Johnston, and FDL director Dominic Sin), and two expert witnesses (one from each side) testified. *Id.* ¶¶ 14–17 (summarizing Sin testimony), 18–21 (FDL's expert testimony), 22–27 (Winczura testimony), 28–32 (Johnston testimony), 33–36 (Canterbury's expert testimony). The Cayman Court received substantial documentary evidence, including: written contracts between the parties, *e.g.*, *id.* ¶¶ 45–46 (SPA and collateral agreement); correspondence as to the same, *e.g.*, *id.* ¶¶ 48–49 (emails and WhatsApp messages

among the parties); and expert and supplemental reports, *e.g.*, *id.* ¶¶ 18–19 (by FDL's expert), 33–35 (by Canterbury's expert).

## 2. Post-Trial Ruling

On August 17, 2023, after circulating a draft judgment to the parties, the Cayman Court delivered its final judgment, which spanned 76 pages. It found as follows:

*Breach of fiduciary duty*: The brokerage agreement between FDL and Canterbury did not create fiduciary duties for Canterbury. *Id.* ¶ 40. But Canterbury separately owed such duties to FDL based on its role helping FDL raise capital and negotiate the SPA with PFS. *Id.* ¶ 61. Canterbury thus had been obliged "to disclose that PFS was a closely connected entity" with it and to "act in good faith to FDL with a view to mitigate any relevant conflicts of interest." *Id.* Canterbury, however, breached these fiduciary duties by "failing to disclose and . . . effectively mitigate the very significant conflicts of interest when it decided to liquidate [FDL's collateral shares] in early December 2018." *Id.* ¶ 63. The Court rejected Winczura's contrary testimony— that she had disclosed to FDL her ownership and control as to PFS—as impeached by "the unambiguous contemporaneous record," which reflected that she had "presented PFS to FDL as an unrelated third party." *Id.* ¶ 49; *see also id.* ¶ 27 (finding that Winczura exhibited "difficulty in distinguishing between what actually occurred and what she wished had occurred").

*Breach of contract*: Canterbury had breached its contractual obligations to FDL whether or not PFS had waived the put option under the SPA. If PFS had waived such, Canterbury breached by refusing to return FDL's collateral shares to it and by liquidating them without FDL's authorization, because PFS's waiver obviated the need to hold them as collateral. *Id.* ¶¶ 64–65, 77–79, 84–85. If not, Canterbury still breached by liquidating as much as it had during the fire sale, because a smaller amount could have been liquidated while leaving

sufficient collateral to cover the option.  On the latter theory, however, Canterbury was arguably liable for a lesser amount in damages.  *Id.*  The parties had agreed that the threshold question of whether PFS had waived the put option was not to be decided by the Cayman Court.  *Id.* ¶¶ 64–65, 92.  That was because a lawsuit raising that dispute—which was principally between FDL and PFS—was pending before a state court for the Eighth Judicial District of Nevada (the "Nevada Court"), applying Nevada law.  *Id.* ¶¶ 12–13, 64–65.  The Cayman Court therefore found for FDL on its breach of contract claim and reserved as to the amount of damages, subject to the Nevada Court's determination whether PFS had waived the put option.  *Id.* ¶ 167.[2]

***Affirmative defenses and counterclaims***:  The Cayman Court rejected Canterbury's affirmative defenses and counterclaims as unsupported.  It found no evidence of market manipulation concerning YRIV, *id.* ¶ 118, no evidence of unclean hands, *id.* ¶ 129, and no evidence of fraudulent representation as to FDL's beneficial ownership in connection with the brokerage agreement, *id.* ¶ 145.

### 3.    Post-Trial Events

***Attempts to secure proceeds of Canterbury's YRIV share sales***:  Canterbury had pledged before trial to keep the proceeds of its sale of FDL's YRIV shares "secure pending the outcome" of the Cayman proceedings.  Bankr. Dkt. 17-10 (freezing order) ¶ 20.  In approximately May 2023, however, the Cayman Court was notified that such assets could not be located.  *Id.*  Canterbury presented a screenshot of a purported treasury bill, which it offered as alternative security, and the Cayman Court ordered that the treasury bill be frozen (*i.e.*, not sold or

---

[2] The Cayman Court reserved judgment as to FDL's claims for conversion and unjust enrichment.  It stated that the conversion claim would likely succeed based on the factual findings on the breach of contract claim.  *Id.* ¶¶ 101–02.

transferred).  *Id.* ¶¶ 20–21.  Canterbury later represented that it had sold the purported treasury bill, in violation of the freezing order.  *Id.*  The Cayman Court ordered Canterbury to deposit the cash equivalent of the treasury bill; Canterbury also failed to comply with that order.  *Id.* ¶¶ 21–22.  The screenshot of the treasury bill later proved to have been a forgery—Canterbury had purchased no such bill.  Bankr. Dkt. 17-13 ("Debarring Order") ¶¶ 32–34.

     ***Appointment of liquidators***:  On December 13, 2023, the Cayman Court appointed Scott and Homer as joint provisional liquidators of Canterbury, calling this "the most compelling case imaginable" for such appointment "to prevent the dissipation or misuse of assets and/or misconduct by [Canterbury's] directors."  *Id.* ¶ 21; Bankr. Dkt. 17 ("Scott Decl.") ¶ 3.  The same day, it ordered Canterbury to pay FDL approximately $2 million, which represented additional funds that Canterbury had held in trust for FDL.  Debarring Order ¶ 10.

     On January 16, 2024, the Cayman Court issued a winding up order as to Canterbury, and appointed Scott and Homer as Canterbury's joint official liquidators ("JOLs").  Winding Up Order at 2–4.

     ***Damages judgment***:  On February 6, 2024, the Cayman Court issued a judgment as to damages, ordering Canterbury to pay FDL approximately $16 million, without prejudice to a future application by FDL for additional damages after the Nevada court determined whether PFS had waived the put option.  *See* Bankr. Dkt. 17-4 (damages order) at 1–2.

     ***Freeze of Winczura's and others' assets***:  On April 26, 2024, the Cayman Court issued an asset-freezing injunction (the "freezing order") as to Winczura, Canterbury Group (a separate Cayman Islands entity owned and controlled by Winczura), and PFS, and ordered those parties to disclose information about their assets.  *See* Debarring Order ¶¶ 4, 24.  None complied.  *Id.* ¶ 28.

*Default judgments and Winczura's non-compliance*:  On June 3, 2024, the Cayman Court entered a default judgment as to Canterbury Group and PFS, and on September 25, 2024, entered the same as to Winczura.  Scott Decl. ¶ 9.

On October 17, 2024, in a 60-page decision, the Cayman Court found that Winczura's "deliberate non-compliance" with its previous orders warranted debarring Winczura and the entities she controlled from defending actions brought against them by the JOLs to recover funds Winczura had misappropriated.  Debarring Order ¶¶ 4 ("It is the most shocking non-compliance I have witnessed during my time as a Grand Court Judge."), 29–30, 164.

### D.    Proceeding in Nevada[3]

In early December 2023, the Nevada Court held a three-day bench trial to resolve, *inter alia*, whether PFS had waived the put option under the SPA.  Dkt. 12 ("Nevada Decision") at 1. Its decision, issued August 21, 2025, largely tracked the Cayman Court's decision as to liability.

Relevant here, the Nevada Court found that, as to the transaction between FDL and PFS, Winczura had "pretend[ed] to be a neutral third party" and had not disclosed—either during the negotiations or before the SPA was fully executed—"that she was the sole owner of PFS."  *Id.* ¶ 11.  It found that, as to the put option, FDL had agreed to that term, understanding that the option "would be null and void if the [YRIV shares] were moved from Canterbury" and that "selling the stock required the shares to be moved from Canterbury."  *Id.* ¶¶ 21–22.  It found that, on or about October 30, 2018—before the $10 million owed to FDL under the SPA had been transferred to FDL—PFS began to sell off "all of its YRIV shares" and that "[w]ithin

---

[3] On August 21, 2025, the Nevada Court issued its findings of fact and conclusions of law in *PFS Ltd. v. Fortunate Drift Ltd. et al.*, No. A-18-783981-C.  For completeness, these are briefly summarized in this subsection.  Because the Nevada decision issued after this appeal was taken, however, it was not included in the S.D.N.Y. bankruptcy record designated for appeal and therefore forms no part of this Court's decision or rationale.

weeks," PFS had sold nearly all such shares.  *Id.* ¶¶ 33–35.  These sales earned PFS approximately $12.8 million, reflecting an approximately $2.8 million profit over the $10 million value assigned to the shares in the SPA.  *See id.* ¶ 36.  The Nevada Court found that, starting in late December 2018—after the price of YRIV shares had cratered—PFS repeatedly attempted to exercise the put option by demanding that FDL repurchase—at the much higher strike price— other shares that PFS had purchased on the open market.  *Id.* ¶¶ 37–38.

On these facts, the Nevada Court found that PFS had waived the put option.  *Id.* ¶¶ 49– 69.  The option was "susceptible to only one reasonable interpretation—that it would necessarily be waived upon the sale of the [YRIV shares], which necessarily meant moving [them] out from PFS' account at Canterbury."  *Id.* ¶ 49.  PFS thus forewent its contractual right to demand that FDL repurchase the shares via the put option.  *Id.* ¶ 59.  Moreover, the Nevada Court found, PFS's actions had "frustrated the purpose" of the put option: its sell-off of YRIV stock "may have contributed to the decline" of that stock's sale price.  *Id.* ¶¶ 60–61.  It would thus be "illogical" to require FDL to buy back YRIV shares from PFS, where PFS had "(1) waived the [put option] and (2) caused the [YRIV] share price to drop such that [PFS would] receive an inequitable benefit on both sides of the transaction."  *Id.* ¶ 62.  "To interpret [the put option] any other way would defy logic, and the plain language of the SPA."  *Id.* ¶ 69.

### E.    Proceeding in Bankruptcy Court

On October 21, 2024, the JOLs, on behalf of Canterbury, filed a petition in the Bankruptcy Court for recognition of the Cayman Islands proceeding and related relief under Chapter 15 of the U.S. Bankruptcy Code.  Bankr. Dkt. 1.[4]

---

[4] The petition was supported by a motion, an attorney declaration, and extensive exhibits.  Bankr. Dkts. 2 (motion and exhibits), 3 (declaration and additional exhibits).

### 1.    Hearing Granting Recognition

On November 12, 2024, United States Bankruptcy Judge David S. Jones held a hearing on the petition.  Dkt. 12 ("Pet. Hr'g Tr.") at 1.  Counsel for Winczura opposed the petition, arguing that recognition would be manifestly contrary to United States public policy, and thus should be denied under 11 U.S.C. § 1506.  *E.g.*, Pet. Hr'g Tr. at 7.

Following argument, Judge Jones issued a bench ruling granting the petition.  *Id.* at 63–78; *see also* November 15 Order.  He noted that Winczura had not adduced any competent evidence to support her last-minute opposition to recognition and related relief.  Pet. Hr'g Tr. at 64–65, 67.  In contrast, he found, the JOLs had made an "evidence-backed showing" that the Cayman proceeding was entitled to recognition as a "foreign main proceeding."  *Id.* at 68–73 (citation omitted).  As additional relief, he ordered that the Cayman Court's freezing order be extended to the United States due to "risk of further dissipation of assets," and authorized certain discovery.  *Id.* at 65, 68–78.  Two weeks later, on November 27, 2024, Judge Jones granted the JOLs' *ex parte* application for discovery from individuals and entities associated with Winczura and/or Canterbury.  Bankr. Dkt. 14; *see also* Bankr. Dkt. 13 at 13.

### 2.    Winczura's Motion to Dismiss the Recognition Proceeding

On January 7, 2025, Winczura moved to dismiss the recognition proceeding and/or to terminate the related relief the Bankruptcy Court had granted.  Bankr. Dkt. 15 ("MTD").  The MTD broadly asserted that the JOLs were acting "at the behest of fraudsters who committed a multimillion-dollar securities fraud," such that recognition or related relief would be "manifestly contrary to the public policy of the United States" under Section 1506.  *Id.* at 5.  Although it attached numerous exhibits, the MTD lacked a declaration attesting to their authenticity.

On January 29, 2025, the JOLs opposed.  Bankr. Dkts. 16 (opposition), 17 (declaration and exhibits).  On February 13, 2025, Winczura replied, appending a declaration that attested to the authenticity of the exhibits attached to the MTD and others.  Bankr. Dkts. 18 (reply), 18-1 *et seq.* (declaration and additional exhibits).

### 3.    The Bankruptcy Court's Denial of Winczura's Motion to Dismiss

On February 27, 2025, the Bankruptcy Court held a hearing on Winczura's motion. Dkt. 7-1 ("Mot. Hr'g Tr.") at 1.  After argument, Judges Jones denied the motion from the bench. *Id.* at 67–70.

He reasoned as follows:  Section 1506 authorizes a Bankruptcy Court to refuse to take an action governed by Chapter 15 of the Bankruptcy Code "if the action would be manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  Courts applying that exception inquire whether (1) "the foreign proceeding was procedurally unfair," and (2) "the application of foreign law or the recognition of a foreign main proceeding under Chapter 15 would severely impinge the value and import of a U.S. statutory or constitutional right, such that granting comity would severely hinder United States bankruptcy courts' abilities to carry out the most fundamental policies and purposes of these rights."  Mot. Hr'g Tr. at 64–65 (cleaned up) (citing *In re Fairfield Sentry Ltd.*, No. 10 Civ. 7311, 2011 WL 4357421, at *8 (S.D.N.Y. Sept. 16, 2011) ("*Fairfield Sentry I*"), *aff'd*, 714 F.3d 127 (2d Cir. 2013) ("*Fairfield Sentry II*")). Foreign proceedings, however, need not be conducted identically to U.S. proceedings.  *Id.* at 65 (citing *In re Schimmelpenninck*, 183 F.3d 347, 365 (5th Cir. 1999)).  And it was "abundantly clear" that U.S. courts "routinely support" proceedings in the Cayman Islands, which has "a very sophisticated" legal system "commonly used in major commercial disputes" and which includes "rights of appeals up to U.K.-based adjudicative bodies."  *Id.*

Here, Judges Jones found, there had not been any showing that the Cayman proceedings had not been "according to law." *Id.* at 65–66. On the contrary, Winczura had participated in the Cayman proceedings, and "her counsel could not or did not assert that there was any procedural disentitlement that could not be addressed." *Id.* at 66. And although a barring order was now in place against Winczura in the Cayman proceedings as a sanction for her failures to abide by court orders and to be forthcoming, she could apply to the Cayman Court for relief from such. *Id.* at 66–67. Thus, Winczura had not shown "any procedural prejudice or violation of a constitutional or statutory right" that would result from recognizing the Cayman proceedings or granting related relief. *Id.*

Insofar as Winczura opposed recognition based on her claim that there had been "a massive fraud" committed by others, that contention, Judge Jones stated, did not support relief under Section 1506. The focus of that provision, he stated, was "whether the foreign proceeding was procedurally unfair" and whether its outcome, if recognized, "would impinge on [a] U.S. statutory or constitutional right." *Id.* at 66. That, he found, was "not the case here." *Id.* In so holding, Judge Jones noted the weighty need, long recognized by U.S. bankruptcy courts, "to extend comity to foreign bankruptcy proceedings," and that courts in the Second Circuit "have repeatedly held that U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding.'" *Id.* at 67 (quoting *In re Atlas Shipping A/S*, 404 B.R. 726, 733 (Bankr. S.D.N.Y. 2009)). He concluded that Winczura's bid to defeat recognition based on her claim of fraud effectively asked the Bankruptcy Court to adjudicate anew creditor claims resolved in the foreign proceeding. *Id.* Winczura's "detailed fact-based presentation," he stated, "really represents a request that this Court second-guess or engage in collateral challenges to the determinations, outcomes, and pendency of proceedings in the

Cayman Islands." *Id.* (cleaned up). That was "something that the case law instructs [a court] not do." *Id.* The exception in Section 1506 had been "applied sparingly and in circumstances that have not been established here." *Id.* at 68.

Judge Jones therefore denied Winczura's motion, while noting that she could pursue relief in the Cayman Court. *Id.* at 69. He found that it would be "inconsistent with comity principles . . . [f]or this court to step into the middle of contentions that should in the first instance be raised and pursued in the Cayman Islands[,] and defang and preempt proceedings that belong there and not here." *Id.*

On February 28, 2025, Judge Jones memorialized his bench ruling in a written order. Bankr. Dkt. 19.

### F.    Procedural History of This Litigation

On March 26, 2025, Winczura filed a notice of appeal from the order denying her motion to dismiss. Dkt. 1. On April 11, 2025, under Federal Rule of Bankruptcy Procedure 8009, Winczura filed a statement of issues for appeal and designated related materials. Dkt. 3. The same day, the foreign representatives designated additional materials for the record on appeal. Dkt. 4. On April 11, 2025, a notice of record of appeal availability was filed. Dkt. 5.

On May 9, 2025, Winczura filed her brief on appeal, attaching the transcript of Judge Jones's bench ruling. Dkt. 7 ("Br."). On June 6, 2025, Canterbury's foreign representatives opposed. Dkt. 8 ("Opp'n"). On June 20, 2025, Winczura replied. Dkt. 9 ("Reply").

On August 29, 2025, the foreign representatives filed a copy of the Nevada Decision, which had issued on August 21, 2025. Dkt. 12.

## II.    Standard of Review

This Court has jurisdiction to hear appeals from "final judgments, orders, and decrees" of bankruptcy courts.  28 U.S.C. § 158(a).  It reviews legal conclusions *de novo* and factual findings for clear error.  *Fairfield Sentry I*, 2011 WL 4357421, at *3.

## III.    Discussion

Winczura argues that recognizing the Cayman proceedings and granting related relief is manifestly contrary to U.S. public policy under Section 1506, and that the Bankruptcy Court erred in denying her motion to dismiss.  She claims that the Cayman proceedings revealed "a multimillion-dollar securities fraud," in which FDL and other unspecified actors sold securities at artificially inflated prices in violation of U.S. securities laws.  Were the foreign representatives to return assets to Canterbury's creditors, she argues, they would be transferring "fraud proceeds" in violation of anti–money laundering laws and regulations.  She argues that the Bankruptcy Court read Section 1506 too narrowly in purportedly holding that, absent procedural error in the Cayman case, it was compelled to recognize the Cayman proceedings.  Reversal is necessary, she argues, because recognition would offend U.S. public policy of "maintain[ing] fair and transparent securities markets and curtail[ing] money laundering."  Br. at 5–7.

The foreign representatives defend the Bankruptcy Court's application of Section 1506. It correctly concluded, they argue, that there was no basis to find that either (1) the Cayman proceedings were procedurally deficient, or (2) recognition and related relief would harm U.S. statutory or constitutional rights.  They assert that the evidence developed in those proceedings does not support Winczura's allegations of wrongdoing by the foreign representatives, FDL, or persons other than herself; that the Cayman Court rightly found that *Winzcura* misappropriated more than $20 million from the debtor and repeatedly violated court orders to provide

14

information as to the missing money's whereabouts; and that the Cayman proceedings gave Winczura a full opportunity to make the arguments she makes here. They cast Winczura's Section 1506 challenge as an improper collateral attack on the Cayman proceedings. Opp'n at 4–8.

The foreign representatives are correct. The Bankruptcy Court correctly found Section 1506 inapplicable, because recognition of the Cayman proceedings and related relief would not offend U.S. public policy.

### A.    Section 1506's Public Policy Exception

Enacted in 2005, Chapter 15 of the Bankruptcy Code incorporated the Model Law on Cross-Border Insolvency of the United Nations Commission on International Trade Law. 11 U.S.C. § 1501(a). Chapter 15's purpose is to promote "international cooperation," "legal certainty," and the "protection and maximization of debtors' assets." *Fairfield Sentry II*, 714 F.3d at 132. To this end, Section 1517 of that chapter directs U.S. courts to enter orders recognizing foreign proceedings where certain conditions are met. 11 U.S.C. § 1517.

Recognition of a foreign proceeding, in turn, makes available relief mechanisms to protect debtors' assets and creditors' interests. Upon recognition of a foreign main proceeding, Section 1520 provides for "certain automatic, nondiscretionary relief, including an automatic stay of all proceedings against the debtor in the United States." *Fairfield Sentry II*, 714 F.3d at 133. And, for both main and nonmain foreign proceedings, Section 1521 authorizes U.S. courts, upon recognition, to grant "any appropriate relief" "necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors," such as taking discovery, entering discretionary stays, and suspending any remaining rights of the debtor to dispose of its assets. 11 U.S.C. § 1521(a).

Salient here, Section 1506 enacts a public policy exception to all of Chapter 15. *Fairfield Sentry II*, 714 F.3d at 133. It reads: "Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. The Second Circuit has emphasized that this exception is "narrow." *Fairfield Sentry II*, 714 F.3d at 139. As the Circuit has noted, the provision's legislative history states: "The word 'manifestly' . . . restricts the public policy exception to *the most fundamental policies of the United States*." *Id.* (emphasis in original) (quoting H.R. Rep. No. 109–31, pt. 1, at 109 (2005)). Every other Circuit to have addressed the provision to date has likewise emphasized its narrowness. *See In re ABC Learning Centres Ltd.*, 728 F.3d 301, 309 (3d Cir. 2013) (exception "is only intended to be invoked under exceptional circumstances concerning matters of fundamental importance" for the United States (citation omitted)); *Jaffé v. Samsung Elecs. Co.*, 737 F.3d 14, 27 (4th Cir. 2013) (similar); *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1069 (5th Cir. 2012) (similar).

Courts applying Section 1506 inquire whether (1) "the foreign proceeding was procedurally unfair," and (2) "the application of foreign law or the recognition of a foreign main proceeding under Chapter 15 would severely impinge the value and import of a United States statutory or constitutional right, such that granting comity would severely hinder United States bankruptcy courts' abilities to carry out the most fundamental policies and purposes of these rights." *Fairfield Sentry I*, 2011 WL 4357421, at *8 (citation omitted). The party invoking the exception bears the burden of showing it applies. *In re Ashapura Minechem Ltd.*, 480 B.R. 129, 144 (S.D.N.Y. 2012).

16

### B.    Evaluation of the Bankruptcy Court's Decision

The Court here evaluates the legal standard applied by the Bankruptcy Court, and then its inquiries into potential procedural or substantive deficiencies.

### 1.    Legal Standard

Identifying the governing legal standard, the Bankruptcy Court stated that determining whether Section 1506 applied required applying two factors:

> "(1) whether the foreign proceeding was procedurally unfair, and
>
> (2) whether the application of foreign law or the recognition of a foreign main proceeding under Chapter 15 would severely impinge the value and import of a U.S. statutory or constitutional right, such that granting comity would severely hinder United States bankruptcy courts' abilities to carry out the most fundamental policies and purposes of these rights."

Mot. Hr'g Tr. at 64–65 (cleaned up) (citing *Fairfield Sentry I*, 2011 WL 4357421, at *8).

The Bankruptcy Court correctly recited the governing standard. Its statement above was drawn from *Fairfield Sentry I*, a decision affirmed by the Second Circuit in the only case in which the Circuit has addressed the reach of Section 1506. *Fairfield Sentry I*, 2011 WL 4357421, at *8; *Fairfield Sentry II*, 714 F.3d at 139–40. District and bankruptcy courts in this Circuit (and elsewhere) have widely applied the same, or substantially the same, standard.[5] Winczura acknowledges that the Bankruptcy Court's statement of law accorded with federal courts' "general approach" to the public policy exception. Br. at 20–21 (quoting *In re British Am. Isle of Venice, Ltd.*, 441 B.R. 713, 716–17 (Bankr. S.D. Fla. 2010)); Reply at 10.

---

[5] *E.g.*, *In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333, 337 (S.D.N.Y. 2006); *In re Culligan Ltd.*, No. 20-12192, 2021 WL 2787926, at *14–16 (Bankr. S.D.N.Y. July 2, 2021); *In re Rede Energia S.A.*, 515 B.R. 69, 92 (Bankr. S.D.N.Y. 2014); *In re Toft*, 453 B.R. 186, 195 (Bankr. S.D.N.Y. 2011); *see also ABC Learning Centres*, 728 F.3d at 309; *In re Manley Toys Ltd.*, 597 B.R. 578, 586 (D.N.J. 2019); *In re Qimonda AG Bankr. Litig.*, 433 B.R. 547, 570 (E.D. Va. 2010).

### 2.    Factor One: Procedural Unfairness

The Bankruptcy Court correctly applied the first Section 1506 factor—procedural unfairness—and found no such deficiency.  *Id.* at 65–67.  Winczura does not challenge that holding.  *See, e.g.*, Br. at 12–18.  Nor could she.  For years, Winczura and her Cayman counsel fully participated in the Cayman proceedings.  Winczura testified during the Cayman bench trial as to liability.  Cayman Liability Decision ¶¶ 22–27.  She was later debarred from participating in future proceedings as a sanction for her repeated violations of the Cayman Court's orders, but that occurred long after liability and damages had been decided.  *See* Debarring Order ¶¶ 29–30, 164.  And Winczura retains the ability to apply for relief from that order.  Mot. Hr'g Tr. at 65–69.  As the Bankruptcy Court rightly noted, the Cayman proceedings did not have to be "identical" in form to U.S. proceedings to warrant recognition—the key issue was whether the Cayman proceedings met "fundamental standards of fairness."  *In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010) (citing *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 457 (2d Cir. 1985)); *see also* Mot. Hr'g Tr. at 65 (citing *Schimmelpenninck*, 183 F.3d at 365).  They did here.

As the Bankruptcy Court further noted, the sophistication of the Cayman legal system reinforced the finding of procedural regularity.  United States courts, it noted, have routinely recognized Cayman proceedings, which commonly resolve major commercial disputes and permit appeals "to U.K.-based adjudicative bodies."  *Id.*; *see, e.g.*, *In re Mod. Land (China) Co.*, 641 B.R. 768, 790 (Bankr. S.D.N.Y. 2022) (recognizing Cayman proceeding and noting that Cayman courts are uniquely situated to liquidate Cayman-incorporated companies effectively); *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 702, 707 (Bankr. S.D.N.Y. 2017) (recognizing Cayman proceeding and noting that objector had not identified "any case in which a U.S.

bankruptcy court found that a Cayman liquidation or scheme proceeding did not satisfy the requirements" of Section 101(23) of the Bankruptcy Code).

### 3.    Factor Two: U.S. Statutory or Constitutional Violations

The Bankruptcy Court also reasonably found that recognizing and granting relief related to the Cayman proceedings would not "impinge on [a] U.S. statutory or constitutional right." Mot. Hr'g Tr. at 66.

In moving to dismiss, Winzcura argued that recognition would enable money laundering and market manipulation.  That argument was based on her characterization of the underlying facts.  She asserted that, before the Cayman proceeding, FDL and individuals associated with it had engaged in a pump-and-dump scheme to profit from YRIV stock.  She contended that the Cayman Court, in finding Canterbury liable, had "misunderstood, ignored, and discounted evidence of FDL's securities fraud."  And, she argued, evidence adduced at the later Nevada bench trial supported that FDL had been aware of Canterbury's relationship with PFS and that FDL had thus "committed fraud on the Cayman Islands court."  She argued that recognition, by assisting the foreign representatives to recover funds owed to FDL as Canterbury's creditor, would thus violate U.S. anti–money laundering laws because such funds were fraud proceeds. *See* MTD at 5–9.

The Bankruptcy Court carefully considered but rejected these arguments, and rightly so. As it explained, Winczura's claims of a "massive fraud" effectively asked the court to "second-guess or engage in collateral challenges" to the Cayman proceedings, which had found no such thing.  Mot. Hr'g Tr. at 66–67 (cleaned up).  As the Bankruptcy Court noted, "considerable weight" was due to that proceeding, given case law guidance to "extend comity to foreign bankruptcy proceedings" and "decline to adjudicate creditor claims that are the subject of" such

proceedings. *Id.* (quoting *Atlas Shipping*, 404 B.R. at 733). Winczura's recourse, the Bankruptcy Court noted, was in the Cayman Court. *Id.* at 68–69. Accordingly, the court found, Winczura had not met her burden to show that recognition would harm a U.S. statutory or constitutional right. *E.g.*, *id.* at 66–67.

As the Bankruptcy Court recognized, Winczura's claims of fraud and money laundering misapplied Section 1506. They effectively asked the Bankruptcy Court to revisit and reject the Cayman Court's factual findings, rather than identifying why adoption of those findings would violate U.S. public policy. As the Bankruptcy Court noted, the Second Circuit has repeatedly held that U.S. courts are not ordinarily to reassess creditor claims resolved in foreign bankruptcy proceedings. *E.g.*, *J.P. Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 424 (2d Cir. 2005). The interest in comity is particularly weighty given the nature of these proceedings, as the "equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding[—]if all creditors could not be bound, a plan of reorganization would fail." *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713–14 (2d Cir. 1987). Winczura's argument that the Cayman Court had erred in rejecting her fraud claims was a quotidian, collateral attack on a judgment by a respected foreign tribunal based on an extensive and carefully developed record. The rejection of her factual take would not offend any fundamental public policy of the United States.

A review of the record before the Bankruptcy Court supports its determination that the Cayman Court's rulings were careful, comprehensive, and reasonable, and merited comity. The proceedings spanned years; there was extensive pretrial litigation, *see, e.g.*, Cayman Liability Decision ¶¶ 49, 54, 106, 109, 146; and at the nearly two-week bench trial, Winczura, representatives of PFS and FDL, and an expert witness from each side testified, *id.* ¶¶ 14–36.

20

The Cayman Court also received extensive documentary evidence, including contracts, communications, and expert reports. *E.g.*, *id.* ¶¶ 18–19, 33–35, 45–49. The Cayman Court's ensuing 76-page opinion was meticulous. It recounted and analyzed the evidence, including setting out its assessments of witness credibility based on its observations. *See, e.g.*, *id.* ¶¶ 22–27 (Winczura's testimony).

Salient here, the Cayman Court pointedly rejected the take on the facts that Winczura urged in moving to dismiss. It rejected Winczura's testimony that she had disclosed her ownership in PFS to FDL as belied by the "unambiguous contemporaneous record," which showed that she had held out "PFS to FDL as an unrelated third party."[6] *Id.* ¶ 49. It found "no sufficient evidence" to conclude that "YRIV was operated as a fraudulent market manipulation scheme," dismissing that allegation as speculation. *Id.* ¶¶ 116–20. And it rejected Canterbury's unclean hands defenses, on the ground that neither Winczura's central allegation "that FDL was engaged in [a] fraudulent scheme," *id.* ¶ 129, nor her claim that FDL had induced Canterbury to enter into the initial brokerage agreement "by making fraudulent representations about its beneficial ownership," *id.* ¶ 145, had been proven. The Bankruptcy Court thus had sound, evidence-based reasons to defer to the Cayman Court's factual conclusions.

---

[6] Winczura cites evidence in the Nevada proceeding that she claims undermines the Cayman Court's findings. *See, e.g.*, MTD at 9 ("The evidence adduced in the Nevada litigating prov[es] that FDL had committed fraud on the Cayman Islands court."). She asserts that in Nevada, "FDL's witness admitted FDL was aware of a relationship between Canterbury and PFS and the relevant facts, at the relevant times." *Id.* at 8. To the extent that that opaque statement implied that FDL had been adequately informed that Winczura controlled PFS, the Nevada Court rejected that premise. It unequivocally found that, as to the transaction between FDL and PFS, Winczura had "pretend[ed] to be a neutral third party" and "did not disclose that she was the sole owner of PFS either during the negotiations or before the SPA was fully executed." Nevada Decision ¶ 11.

The limited case law addressing Section 1506's scope underscores the correctness of the Bankruptcy Court's conclusions that the public policy exception did not apply here, and that the exception is not intended to invite factual challenges to the determinations made in a procedurally sound foreign proceeding. Indeed, only two cases in this Circuit have refused recognition or associated relief as manifestly contrary to U.S. public policy, and each is far afield.

In *In re Toft*, an insolvency administrator in a German action, seeking discovery, initiated a Chapter 15 proceeding to gain access to the email accounts of the debtor, a natural person who had used internet service providers in the United States. 453 B.R. 186, 188 (Bankr. S.D.N.Y. 2011). The request for access, however, far exceeded the categories of discovery ordinarily available to a bankruptcy trustee. The administrator asked the bankruptcy court to enforce a German order compelling the service providers to disclose the debtor's emails *ex parte*, "as well as what can only be described as a wiretap of [the debtor's] *future* e-mail correspondence." *Id.* at 189 (emphasis added). The bankruptcy court found that adopting such relief would violate the Stored Communications Act, 18 U.S.C. §§ 2701 *et seq.*, and the Wiretap Act, 18 U.S.C. §§ 2511 *et seq.*, and might subject anyone involved in its execution to "U.S. criminal liability." *Id.* As a result, the court held, the case was "one of the rare cases" in which Section 1506 barred the relief sought by a foreign representative as manifestly contrary to U.S. public policy. *Id.*

Similarly, in *In re Gold & Honey*, an automatic stay had been imposed as a result of a Chapter 11 filing in the United States. 410 B.R. 357, 360, 363 (Bankr. E.D.N.Y. 2009). A creditor "knowing[ly] and willful[ly]" violated that stay by bringing an insolvency proceeding in Israel as to the same debtor. *Id.* at 368–69. The receivers in the Israeli proceeding, who had been appointed in clear violation of the stay, nonetheless sought recognition of that foreign

proceeding, and did so in the same U.S. bankruptcy court that had ordered the stay that was being violated. *Id.* at 363–64, 368–69. The bankruptcy court, acknowledging that Section 1506 "should be applied narrowly," refused to reward the creditor's end-run around the stay. *Id.* at 372. It denied recognition as contrary to public policy. As the bankruptcy court explained, recognizing the Israeli proceeding, given its abusive roots, would "severely hinder United States bankruptcy courts' abilities to carry out two of the most fundamental policies and purposes" of stays under Section 362(a) of the Bankruptcy Code: to prevent one creditor from gaining unfair advantage over others, and to efficiently distribute a debtor's assets in accordance with all creditors' relative priorities. *Id.* at 372–73.

To state the obvious, this case is far afield from *Toft* and *Gold & Honey*. In each of those cases, the relief sought, whether recognizing or additive to a foreign proceeding, would cause blatant facial violations of U.S. law. There is no such argument here. Winczura does not argue that recognizing the Cayman proceedings, or ordering limited related relief, would itself violate a U.S. statute or the Constitution. And, to the extent she alleges that recognition and related relief would facilitate money laundering, the premise of that claim—that others committed a securities fraud, the proceeds of which would be transferred upon recognition—was exhaustively considered and rejected by the Cayman Court, which found no such fraud.

More apposite are the cases rejecting challenges to recognition or relief under Section 1506. These underscore why that exception does not apply here.

In *In re Poymanov*, the bankruptcy court recognized a Russian insolvency proceeding. It rejected an argument that Section 1506 applied because the Russian proceeding was purportedly "part of a corporate raiding scheme against" the debtor. 571 B.R. 24, 38–39 (Bankr. S.D.N.Y. 2017). As in this case, the court held that the evidence did not establish that the

23

petitioner had engaged in any bad faith dealing or criminal activity in connection with the foreign proceeding.  *Id.*; *see also In re Sabadash*, 660 B.R. 304, 308–311 (Bankr. C.D. Cal. 2024) (recognizing Russian proceeding while requiring foreign representative to seek future approval to enforce any Russian judgments against debtor, so that U.S. bankruptcy court could evaluate these to ensure that they were not manifestly contrary to U.S. sanctions policy).

In *Fairfield Sentry II*, a creditor argued that recognizing a debtor's liquidation in the British Virgin Islands ("BVI") was manifestly contrary to U.S. public policy because certain court records in the BVI proceedings were sealed.  714 F.3d at 132.  The Second Circuit affirmed the bankruptcy and district courts' decisions to recognize the BVI proceeding.  *Id.* at 132, 140.  It held that the limited sealing was not inconsistent with how U.S. courts balance the right of public access against legitimate privacy concerns.  *Id.* at 139–40.  And it found that the creditor had not established that "unfettered public access to court records" was "so fundamental in the United States that recognition of the BVI liquidation constitutes one of those exceptional circumstances contemplated in Section 1506."  *Id.*  Other cases in this District are in accord, and have rejected arguments under Section 1506 even when there was a degree of tension between the foreign proceeding and U.S. public policy.[7]

Here, Winczura's challenge consists of a factual dispute.  She contends that the Cayman Court factually erred in finding—including based on credibility determinations—that FDL was

---

[7] *See, e.g.*, *In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333, 336–37 (S.D.N.Y. 2006) (rejecting Section 1506 challenge and recognizing Canadian proceeding that did not include right to trial by jury, reasoning that although such right was "an important component of our legal system," federal courts enforce "foreign judgments by foreign courts for whom the very idea of a jury trial is foreign"); *In re Rede Energia S.A.*, 515 B.R. 69, 103–07 (Bankr. S.D.N.Y. 2014) (recognizing Brazilian proceeding despite different distribution priority rules under Brazilian bankruptcy law); *In re Culligan Ltd.*, No. 20-12192, 2021 WL 2787926, at *13–16 (Bankr. S.D.N.Y. July 2, 2021) ("courts have generally found that section 1506 does not prohibit recognition in situations where the debtor has engaged in bad faith").

not engaged in securities fraud.  The Bankruptcy Court properly deferred to the well-developed record of the Cayman proceedings on that point.  And it rightly held that Winczura's collateral attack on the factfinding in those proceedings does not implicate Section 1506.  Winczura has not shown any tension, much less manifest contradiction, between the Cayman proceedings and any fundamental public policy, constitutional or statutory, of the United States.

The Court accordingly affirms the Bankruptcy Court's finding that recognition and related relief did not pose any harm to U.S. statutory or constitutional rights.  *See, e.g.*, *Fairfield Sentry II*, 714 F.3d at 140; *Ephedra Prods.*, 349 B.R. at 336–37; *Rede Energia S.A.*, 515 B.R. at 103–07; *Culligan Ltd.*, 2021 WL 2787926, at *13–16.

### C.    Winczura's Remaining Arguments

Winczura makes two additional arguments.  Each is quickly put aside.

Winczura argues that her appeal "presents a purely legal question about the scope of Section 1506."  Reply at 6.  She argues that the Bankruptcy Court misconstrued Section 1506 as inapplicable where recognition would promote securities fraud, and casts the Bankruptcy Court as holding that Section 1506 applied only to procedural deficiencies in the foreign proceeding. Br. at 6.  On that basis, she offers hypotheticals in which recognition would cause actions in the United States that violate U.S. laws against human trafficking and controlled substances distribution.  *Id.* at 16–20.  Winczura's depiction of the Bankruptcy Court's analysis, however, is wrong.  The Bankruptcy Court expressly recognized that Section 1506 could bar recognition based on substantive aspects of a foreign proceeding where, if adopted, such could harm U.S. constitutional or statutory rights.  It stated:

> The argument presented against or in favor of terminating recognition on the basis of [Section] 1506 is that this is all fuel for a massive fraud, but the focus under [Section 1506 is], again, whether the foreign proceeding was procedurally unfair

25

*and whether the law or the main proceeding would impinge on [a] U.S. statutory
or constitutional right, and I find that that's not the case here.*

Mot. Hr'g Tr. at 66 (emphasis added).  The Bankruptcy Court rejected Winczura's arguments

that recognition or related relief would impinge on U.S. statutory or constitutional rights.  Given

the factual record and findings from the Cayman proceedings, that determination was clearly

sound.

Winczura relatedly construes the Bankruptcy Court to have held that "a massive fraud"

infecting or underpinning the foreign proceeding could not be the basis to deny recognition under

Section 1506.  The Bankruptcy Court nowhere so held.  It merely rejected Winczura's claim that

the Cayman Court, following the bench trial, had factually erred in rejecting her claim of such a

fraud.

## CONCLUSION

For the above reasons, the Court affirms the Bankruptcy Court's decision.

The Clerk of Court is respectfully directed to terminate all pending motions and to close

this case.


SO ORDERED.

_Paul A. Engelmay_
_____
PAUL A. ENGELMAYER
United States District Judge


Dated: November 19, 2025
       New York, New York